ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA            :
                                    :
           -v.-                     :         **SEALED INDICTMENT**
                                    :
CHRISTOPHER KLINE,                  :         12 Cr. ___
                                    :
                Defendant.          :    **12 CRIM 701**
                                    :
- - - - - - - - - - - - - - - - - -x

## COUNT ONE

(Conspiracy to Commit Securities Fraud
and to Commit Commercial Bribery)

The Grand Jury charges:

### Relevant Entities and Individuals

1.     At all times relevant to this Indictment,
CHRISTOPHER KLINE, the defendant, was a stock broker employed at
a securities brokerage firm located in York, Pennsylvania, that
was registered with the Financial Industry Regulatory Authority
("FINRA"), an independent regulator for securities firms doing
business in the United States.

2.     From in or about September 1997 through in or
about September 2007, G&S Minerals, Inc. ("G&S Minerals") was a
Nevada corporation, with headquarters in Las Vegas, Nevada.  G&S
Minerals' common stock was publicly traded on the Pink Sheets, an
inter-dealer quotation service that provided quotations, prices,
and financial information for certain over-the-counter securities
and issuers.  G&S Minerals's common stock traded under the symbol
"GSML."

DATE FILED: _____
DOC #: _____
ELECTRONICALLY FILED
DOCUMENT
USDC SDNY

3.    At all relevant times, William Curtis ("Curtis"), a co-conspirator not named as a defendant herein, was a "promoter" of G&S Minerals, meaning that Curtis was involved in trying to raise money for G&S Minerals through the sale of its stock to the public.

## Overview Of The Securities Fraud Scheme

4.    From in or about July 2007 through in or about February 2008, CHRISTOPHER KLINE, the defendant, Curtis, and others known and unknown, schemed to defraud investors in G&S Minerals stock by arranging for secret bribes to be paid to a purported financial advisor in exchange for the financial advisor inducing his purported clients to purchase G&S Minerals stock. These purchases permitted Curtis and others to generate cash by selling their own G&S Minerals stock holdings.

5.    In furtherance of the scheme, CHRISTOPHER KLINE, the defendant, and Curtis, each had discussions with a confidential informant ("CI-1") working at the direction of the Federal Bureau of Investigation (the "FBI"). CI-1 purported to be a financial advisor who could induce investors to purchase G&S Minerals stock, in return for secret, undisclosed kickbacks that Curtis and his co-conspirators would pay to CI-1. According to the plan, CI-1 would convince one or more "clients" to purchase G&S Minerals stock. The objective was to fill the "client's" stock order using sales of G&S Minerals shares from accounts controlled by Curtis. Curtis's shares of G&M Minerals stock

would also be sold to others in the marketplace at an inflated price. KLINE, a stockbroker, served as the "middle man" between CI-1 and Curtis. In that role, KLINE instructed CI-1 concerning volume and price targets for CI-1's purchases, and attempted to ensure that Curtis's sell orders matched CI-1's buy orders.

6. CHRISTOPHER KLINE, the defendant, Curtis, and CI-1 agreed that when CI-1 convinced his purported "clients" to purchase G&S Minerals stock, Curtis would pay CI-1 approximately 30 percent of the purchase orders (including actual sales proceeds) placed by CI-1's "clients." KLINE, Curtis and CI-1 agreed that these payments to CI-1 would not be disclosed to CI-1's "clients." In addition, CI-1 represented to KLINE and Curtis that the purchasers would hold the stock and not sell it for a substantial period of time. In exchange for his participation in the scheme, KLINE received approximately 10 percent of the cash bribe paid to CI-1.

## The Fraudulent G&S Minerals Scheme Begins

7. On or about July 12, 2007, CHRISTOPHER KLINE, the defendant, met with CI-1 at a restaurant in Stroudsbury, Pennsylvania, which meeting was recorded. CI-1 and KLINE had previously engaged in similar schemes whereby CI-1 had caused clients to purchase stock of a publicly traded company in exchange for a cash bribe. In their conversation, KLINE and CI-1 discussed, in substance and in part, their prior business dealings and CI-1 asked KLINE to find more deals where he could

3

receive a cash payment for causing clients to purchase stock. CI-1 told KLINE that he would give him "10% of what he gets."

8.     In furtherance of the scheme, on or about July 18, 2007, CHRISTOPHER KLINE, the defendant, spoke with CI-1 in a recorded telephone conversation.  In that conversation, KLINE stated, in substance and in part, that he knew a person named "Bill Curtis" who might be interested in doing business with CI-1.  In subsequent recorded communications over the next several days, KLINE provided CI-1 with Curtis's telephone number.

9.     In furtherance of the scheme, on or about August 10, 2007, Curtis spoke with CI-1 in a recorded telephone conversation.  Curtis and CI-1 discussed doing business together, and how they could direct stock trades to achieve the objective of the scheme.  Curtis informed CI-1 that he (Curtis) was currently working on "GSML" (the stock ticker symbol for G&S Minerals).  CI-1 told Curtis that he had "full discretion" over "six or seven accounts that I deal with on a regular basis."  CI-1 also told Curtis that [CI-1] had approximately $2,500,000 "at my disposal," and "I know that I can definitely handle whatever you want me to do."  CI-1 told Curtis that CI-1 could direct the stock trades so that Curtis would know "when it's coming and where it's coming from."  In exchange, CI-1 asked to be paid, and Curtis agreed to pay, secret commissions of approximately 30 percent of the proceeds of the purchase orders (including actual sales proceeds) that would not be disclosed to CI-1's clients.

10.    In furtherance of the scheme, on or about August 13, 2007, CHRISTOPHER KLINE, the defendant, spoke with CI-1 in a recorded telephone conversation.    In the conversation, KLINE stated, in substance and in part, that Curtis was opening a brokerage account with KLINE and had sent CI-1 stock certificates.    CI-1 stated that he would be prepared to "do 30 or 40 to start" and that he would be prepared to start the following week.

### Purchases Of G&S Minerals Stock Pursuant To The Scheme

11.    In furtherance of the scheme, on or about August 24, 2007, in several recorded telephone conversations, CHRISTOPHER KLINE, the defendant, and CI-1, discussed the fact that CI-1 would purchase approximately 40,000 shares of G&S Minerals stock at approximately $0.065 per share.

12.    On or about August 24, 2007, using an undercover brokerage account at a brokerage firm located in Jersey City, New Jersey (the "Brokerage Firm"), that purported to be owned by a "client" of CI-1, the FBI purchased approximately 40,000 shares of G&S Minerals stock at a price of approximately $0.065 per share, for a total cost of approximately $2,600, not including commissions and fees.

13.    In furtherance of the scheme, on or about August 27, 2007, in several recorded telephone conversations, CHRISTOPHER KLINE, the defendant, and CI-1 discussed the fact

that CI-1 would purchase approximately 50,000 shares of G&S Minerals stock at approximately $0.0774 per share.

14.   On or about August 27, 2007, using an undercover brokerage account at the Brokerage Firm that purported to be owned by a "client" of CI-1, the FBI placed an order for the purchase of approximately 50,000 shares of G&S Minerals stock at a price of approximately $0.0774 per share, for a total cost of approximately $3,850, not including commissions and fees.

15.   In furtherance of the scheme, from on or about August 28, 2007, through on or about August 31, 2007, in several recorded telephone conversations, CHRISTOPHER KLINE, the defendant, and CI-1 discussed various purchases of G&S Minerals stock that CI-1 would make on behalf of his purported "clients" and corresponding sell orders that KLINE caused to be placed.

16.   On or about August 28, 2007, using an undercover brokerage account at the Brokerage Firm that purported to be owned by a "client" of CI-1, the FBI placed an order for the purchase of approximately 50,000 shares of G&S Minerals stock at a price of approximately $0.094 per share, for a total cost of approximately $4,700, not including commissions and fees.

17.   On or about August 29, 2007, using an undercover brokerage account at the Brokerage Firm that purported to be owned by a "client" of CI-1, the FBI purchased approximately 50,000 shares of G&S Minerals stock at a price of approximately

$0.105 per share, for a total cost of approximately $5,250, not including commissions and fees.

18.   On or about August 30, 2007, using an undercover brokerage account at the Brokerage Firm, that purported to be owned by a "client" of CI-1, the FBI placed an order for the purchase of approximately 50,000 shares of G&S Minerals stock at a price of approximately $0.11 per share, for a total cost of approximately $5,500, not including commissions and fees.

19.   On or about August 31, 2007, using an undercover brokerage account at the Brokerage Firm that purported to be owned by a "client" of CI-1, the FBI placed an order for the purchase of approximately 50,000 shares of G&S Minerals stock at a price of approximately $0.195 per share, for a total cost of approximately $9,750, not including commissions and fees.

## The First Bribe Payment

20.   Pursuant to the scheme, on or about August 30, 2007, in a recorded phone call, CI-1 told CHRISTOPHER KLINE, the defendant, that Curtis should wire the funds due to CI-1 for the transactions between approximately August 24, 2007 through August 30, 2007, to a bank account in New York, New York, which was an undercover bank account utilized by the FBI (the "Undercover Bank Account").

21.   Pursuant to the scheme, on or about September 4, 2007, approximately $9,567 was wire transferred to the Undercover Bank Account, from an account in the name of "William Edward

Curtis," located in Naperville, Illinois.  This payment constituted a kickback of approximately 30 percent of (1) the approximately $7,850 worth of G&S Minerals stock purchased on or about August 24, 2007 and August 29, 2007 by CI-1's purported "clients," and (2) the approximately $23,800 worth of orders placed by CI-1's purported "clients" on or about August 27, 2007, August 28, 2007, August 30, 2007 and August 31, 2007, none of which were executed.

      22.  In furtherance of the scheme, on or about September 6, 2007, CHRISTOPHER KLINE, the defendant, Curtis, and CI-1 had a meeting in Queens, New York, which was recorded. Prior to the meeting, CI-1 gave KLINE $1,000 in cash, which represented KLINE's share of the $9,567 bribe that Curtis had paid to CI-1.  During the meeting, KLINE, Curtis, and CI-1 discussed continuing the G&S Minerals scheme and discussed continuing the scheme with additional companies identified by Curtis.  Curtis and KLINE discussed the fact that "everything works . . . pretty smooth" as long as KLINE is the "gatekeeper." KLINE, Curtis, and CI-1 also discussed ways to make sure that CI-1's purchase orders could be filled using stock that CURTIS controlled.  CI-1 told Curtis "I can tell you where it's coming from . . . so you don't miss it."  During the same meeting, KLINE, Curtis and CI-1 also discussed concealing the cash payments from Curtis to CI-1 by falsely making them appear to be "consulting" fees.

### Further Purchases Of G&S Minerals Stock Pursuant To The Scheme

23.   On or about September 7, 2007, using an undercover brokerage account at the Brokerage Firm that purported to be owned by a "client" of CI-1, the FBI purchased approximately 57,500 shares of G&S Minerals stock at a price of approximately $0.16 per share, for a total cost of approximately $9,200, not including commissions and fees.

24.   Also on September 7, 2007, in furtherance of the fraudulent scheme, CHRISTOPHER KLINE, the defendant, and CI-1 discussed, in recorded telephone conversations, the fact that some of CI-1's purchase orders for G&S Minerals stock had not been filled by shares owed by Curtis.   KLINE informed CI-1 that CI-1 nevertheless would be paid for the executed trades involving CI-1, CI-1's purchase orders that had been filled by sellers of G&S Minerals stock other than CURTIS, and CI-1's unexecuted purchase orders for G&S Minerals stock.

25.   On or about September 11, 2007, using an undercover brokerage account at the Brokerage Firm that purported to be owned by a "client" of CI-1, the FBI purchased approximately 30,500 shares of G&S Minerals stock at a price of approximately $0.146 per share, for a total cost of approximately $4,453, not including commissions and fees.

26.   On or about September 12, 2007, using an undercover brokerage account at the Brokerage Firm that purported to be owned by a "client" of CI-1, the FBI purchased

approximately 40,000 shares of G&S Minerals stock at a price of
approximately $0.14 per share, for a total cost of approximately
$5,600.

      27.   On or about September 13, 2007, using an
undercover brokerage account at the Brokerage Firm that purported
to be owned by a "client" of CI-1, the FBI placed an order to
purchase approximately 25,800 shares of G&S Minerals stock at a
price of approximately $0.154 per share, for a total cost of
approximately $3,973, not including commissions and fees.

      28.   On or about September 14, 2007, using an
undercover brokerage account at the Brokerage Firm that purported
to be owned by a "client" of CI-1, the FBI purchased
approximately 25,000 shares of G&S Minerals stock at a price of
approximately $0.16 per share, for a total cost of approximately
$4,000, not including commissions and fees.

      29.   On or about September 14, 2007, using an
undercover brokerage account at the Brokerage Firm that purported
to be owned by a "client" of CI-1, the FBI purchased
approximately 25,000 shares of G&S Minerals stock at a price of
approximately $0.17 per share, for a total cost of approximately
$4,250, not including commissions and fees.

### The Second Bribe Payment

      30.   On or about September 18, 2007, approximately
$9,450 was wire transferred to the Undercover Bank Account, in
New York, New York, from an account in the name of "William

Edward Curtis," located in Naperville, Illinois.  This payment constituted a kickback of approximately 30 percent of (1) the approximately $27,503 worth of G&S Minerals stock purchased on or about September 7, 2007, September 11, 2007, September 12, 2007 and September 14, 2007, by CI-1's purported "clients," and (2) a $3,973 order placed by CI-1's purported "client" on or about September 13, 2007, that was not executed.

        31.  In furtherance of the scheme, on or about September 20, 2007, CHRISTOPHER KLINE, the defendant, and CI-1 had a meeting in New York, New York, which was recorded.  At that meeting, KLINE and CI-1 discussed an additional deal whereby CI-1 would cause his purported "clients" to purchase and hold stock of a publicly traded company in exchange for a cash bribe.  In addition, CI-1 gave KLINE $1,000 in cash, representing KLINE's share of the $9,450 bribe that Curtis had paid to CI-1.

        32.  In furtherance of the scheme, from on or about September 21, 2007, through on or about February 19, 2008, CHRISTOPHER KLINE, the defendant, and CI-1 had telephone conversations, which were recorded.

### STATUTORY ALLEGATIONS

### The Conspiracy

        33.  From in or about July 2007 through in or about February 2008, in the Southern District of New York and elsewhere, CHRISTOPHER KLINE, the defendant, and others known and unknown, willfully and knowingly did combine, conspire,

11

confederate, and agree together and with each other to commit an offense against the United States, namely, (a) to commit fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (b) to travel in interstate commerce and use the mails and facilities in interstate and foreign commerce, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, specifically, commercial bribery, in violation of New York State Penal Law Sections 180.00 and 180.03.

## Objects of the Conspiracy

### Securities Fraud

34.   It was a part and an object of the conspiracy that CHRISTOPHER KLINE, the defendant, together with others known and unknown, willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of G&S Minerals common stock, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the

12

circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Travel Act: Commercial Bribery

35.   It was further a part and object of the conspiracy that CHRISTOPHER KLINE, the defendant, together with others known and unknown, willfully and knowingly would and did travel in interstate commerce and use the mails and facilities in interstate and foreign commerce, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, specifically, commercial bribery, in violation of New York State Penal Law Sections 180.00 and 180.03; and thereafter would and did perform and attempt to perform an act to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of such unlawful activity, all in violation of Title 18, United States Code, Section 1952(a)(3).

### Means and Methods of the Conspiracy

36.   Among the means and methods by which CHRISTOPHER KLINE, the defendant, and his co-conspirators, would and did carry out the conspiracy were the following:

13

a.   A co-conspirator paid secret bribes to a purported financial advisor in order to induce him to cause his retail "clients" to purchase and hold G&S Minerals stock.

b.   KLINE was paid a percentage of the secret bribe paid to the purported financial advisor.

c.   Members of the conspiracy, including KLINE, used interstate wires and the facilities of interstate and foreign commerce in furtherance of the object of the conspiracy.

### Overt Acts

37.   In furtherance of the conspiracy and to effect its unlawful objects, CHRISTOPHER KLINE, the defendant, together with others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about July 18, 2007, KLINE spoke by telephone with CI-1, about CI-1 entering into an arrangement with Curtis.

b.   On or about August 30, 2007, KLINE spoke by telephone with CI-1 about a wire transfer of funds to CI-1.

c.   On or about September 4, 2007, Curtis wire transferred approximately $9,567, representing approximately 30 percent of certain purchase orders placed by CI-1 (including sales proceeds) of G&S Minerals stock, into an account maintained by the FBI in New York, New York, from an account in the name of "William Edward Curtis."

d.   On or about September 6, 2007, in Queens, New York, KLINE met with CI-1 and CI-1 gave KLINE $1,000 in cash for KLINE's participation in the scheme.

e.   On or about September 18, 2007, Curtis wire transferred approximately $9,450, representing approximately 30 percent of the purchase orders placed by CI-1 (including sales proceeds) of G&S Minerals stock, into an account maintained by the FBI in New York, New York, from an account in the name of "William Edward Curtis."

f.   On or about September 20, 2007, in New York, New York, KLINE met with CI-1 and CI-1 gave KLINE $1,000 in cash for KLINE's participation in the scheme.

g.   On or about February 19, 2008, KLINE spoke by telephone with CI-1.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

38.   The allegations set forth in paragraphs 1 through 32, and 36 through 37 of this Indictment are repeated and realleged as if set forth fully herein.

39.   From in or about July 2007 through in or about September 2007, in the Southern District of New York and elsewhere, CHRISTOPHER KLINE, the defendant, together with others known and unknown, wilfully and knowingly, by the use of the

15

means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with purchases and sales of G&S Minerals common stock.

> (Title 15, United States Code, Sections 78j(b) and 78ff;
> Title 17, Code of Federal Regulations, Section 240.10b-5;
> Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

40.   As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Section 371; and Title 17, Code of Federal Regulations, Section 240.10b-5, as alleged in Counts One and Two of this Indictment, CHRISTOPHER KLINE, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code,

Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses.

## Substitute Assets Provision

41.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)     cannot be located upon the exercise of due diligence;

(ii)    has been transferred or sold to, or deposited with, a third party;

(iii)   has been placed beyond the jurisdiction of the court;

(iv)    has been substantially diminished in value; or

(v)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

(Title 15, United States Code, Sections 78j(b), 78ff;
Title 18, United States Code, Sections 371 and 981;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461;
and Title 17, Code of Federal Regulations,
Section 240.10b-5.)

Foreperson

PREET BHARARA
United States Attorney

17

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

- v. -

CHRISTOPHER KLINE,

**Defendant.**

## SEALED INDICTMENT

12 Cr. _____

(Title 18, United States Code, Sections
371 and 2; Title 15, United States Code,
Sections 78j(b) & 78ff; Title 17, Code of
Federal Regulations, Sections 240.10b-5.)

PREET BHARARA
United States Attorney.

*[signature]*

Sep 13, 2012

Filed Sealed indictment.

U.S.M.J., Debra Freeman